**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PPC BROADBAND, INC., doing business**
**as PPC,**

                                                    **Plaintiff,**

        **vs.**                                          **5:14-cv-00315**
                                                    **(MAD/TWD)**

**TRANSFORMIX ENGINEERING INC.,**

                                    **Defendant.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**HISCOCK & BARCLAY**                   **ELIZABETH A. COMINOLLI, ESQ.**
One Park Place                          **JASON C. HALPIN, ESQ.**
300 South State Street                  **JON P. DEVENDORF, ESQ.**
Syracuse, New York 13202-2078
Attorneys for Plaintiff

**MACKENZIE HUGHES LLP**                **STEPHEN T. HELMER, ESQ.**
101 South Salina Street                 **WILLIAM B. HUNT, ESQ.**
PO Box 4967
Syracuse, New York 13221-4967
Attorneys for Defendant


**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

        On March 21, 2014, Plaintiff commenced this action against Defendant, alleging breach of

contract, breach of express and implied warranties, and negligence.  _See_ Dkt. No. 1.  Presently

before the Court is Defendant's motion to dismiss the complaint pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure or, in the alternative, to dismiss the complaint based upon the

doctrine of _forum non conveniens_.  _See_ Dkt. No. 11.  Plaintiff has opposed Defendant's motion.

_See_ Dkt. No. 12.

## II. BACKGROUND[1]

Plaintiff is a Delaware corporation with its principal place of business in East Syracuse, New York.  Dkt. No. 1 at ¶ 2.  Defendant is a Canadian corporation with its principal place of business in Kingston, Ontario, Canada.  *See id.* at ¶ 3; Dkt. No. 11-2 at ¶ 3.  Defendant supplies specialized engineering and manufacturing services and products, including custom-designed automation systems and continuous motion assembly machines for high-volume production, throughout the world.  *See* Dkt. No. 1 at ¶ 11.

In 2006, the Communication Products division of Thomas & Betts Corporation ("Thomas & Betts"), which manufactured a variety of products for the cable and telecommunications industries, sought to improve efficiency in the production of its SNAP-N-SEAL brand of coaxial cable connectors by obtaining automated technology for its manufacturing facility in Horseheads, New York.  *See id.* at ¶¶ 8-9.  Specifically, Thomas & Betts desired technology that would increase the number of coaxial cable connector parts produced per minute and decrease the number of machine operators required.  *See id.* at ¶ 9.  In response to a request for information from Thomas & Betts, Defendant indicated that it could provide a specialized automated assembly machine that would meet the specific efficiencies sought by Thomas & Betts.  *See id.* at ¶ 10.  After negotiations, in October 2007, Thomas & Betts agreed to fund an engineering study in which Defendant aimed to produce a prototype machine capable of achieving the production rate and operator efficiency specified by Thomas & Betts.  *Id.* at ¶ 12.

Defendant originally anticipated that the prototype study would take two and one-half months.  *Id.* at ¶ 13.  However, Defendant's work on the prototype was delayed by an internal

---

[1] The factual background is derived from the allegations in Plaintiff's complaint, which are presumed to be true solely for the purposes of this motion.

resource issue, and Defendant completed the prototype in October 2008. *See id.* at ¶¶ 13-16. The prototype failed to meet the desired run rate in testing performed by Thomas & Betts. *Id.* at ¶ 16. While Defendant made efforts to remedy the prototype's performance issues, Thomas & Betts and Defendant continued to negotiate the terms of an agreement for the sale and purchase of a high speed assembly machine that would meet the operational requirements conveyed by Thomas & Betts. *See id.* at ¶¶ 17-18.

As a result, Thomas & Betts and Defendant entered into a purchase and sale agreement as of September 18, 2009 (the "Agreement"), in which Defendant agreed to deliver a high-speed continuous motion assembly machine that would produce coaxial cable connectors at a specific run rate per minute when operated by a single operator (the "Machine"). *Id.* at ¶¶ 19-20. The Agreement also contained specifications pertaining to the Machine's availability, performance, and yield. *Id.* at ¶ 21. The Agreement provided that the anticipated lead time from the start of the project to an initial test at Defendant's facility was eight and one-half months. *Id.* at ¶ 22.

After delays purportedly caused by Defendant's work on other projects, in March 2010, Defendant conducted the initial project meeting at the Thomas & Betts facility in Horseheads. *See id.* at ¶ 23. Defendant anticipated that the Machine would be ready for Factory Acceptance Testing ("FAT") by December 2010. *Id.* After the meeting, Thomas & Betts and Defendant maintained regular communication regarding the project. *See id.* at ¶ 25. During this period, Thomas & Betts provided Defendant with data that included drawings of the cable connectors and information on the component materials that would pass through the Machine, typical component non-conformities, and Thomas & Bett's current connector assembly machines. *Id.*

At some time between March 2010 and December 2011, Plaintiff's parent organization, Belden Inc., acquired Thomas & Bett's Communications Products business – including the Agreement – and integrated it into Plaintiff. *See id.* at ¶ 26.

After a series of additional delays, Defendant presented the Machine to Plaintiff for FAT at Defendant's facility in Ontario on December 12, 2011. *See id.* at ¶ 27. Defendant stopped FAT on the second day of testing because of a problem with one of the Machine's feeder components. *See id.* at ¶ 28. After repairs, FAT resumed in February 2012. *Id.* at ¶ 29. During this testing, Defendant allegedly utilized multiple employees for each testing period, contrary to the Agreement's requirement that the Machine be operated by a single operator, and cleaned the Machine for several hours after each eight-hour testing period, which was not supposed to be necessary under normal operating conditions. *See id.*

In March 2012, Defendant delivered the Machine to Plaintiff's Horseheads facility for Site Acceptance Testing ("SAT"). *Id.* at ¶ 30. Defendant postponed SAT almost immediately because of problems with the Machine's pneumatics. *See id.* Defendant resumed and completed SAT of the Machine in late April 2012. *See id.*

Beginning almost immediately following SAT, Plaintiff experienced reoccurring problems with the Machine. *See id.* at ¶ 32. From April through August 2012, Plaintiff submitted numerous requests that Defendant fix the Machine. *See id.* at ¶ 33. In response, Defendant made some efforts to remedy the Machine's defective performance. *See id.* Nonetheless, the problems continued, and on August 24, 2012, Plaintiff took the Machine out of service because of continued output shortfalls and damage to connector assemblies. *See id.* at ¶ 34.

On or about September 13, 2012, Plaintiff and Defendant met to discuss the Machine's performance issues. *Id.* at ¶ 35. Defendant acknowledged that it had anticipated certain

mechanical issues requiring post-delivery work that resulted from oversights in the Machine's original design. *See id.* Defendant committed to ensuring that the Machine would achieve the agreed-upon productivity requirements and agreed to toll all warranty periods until the Machine could be placed back into service at the required production level. *See id.* at ¶¶ 35-36.

From September 2012 through April 2013, Defendant visited Plaintiff's Horseheads facility on several occasions in an effort to fix the Machine's production problems. *See id.* at ¶ 37. Defendant also brought a number of the Machine's parts back to its own facility for repairs. *See id.* Defendant's repair efforts proved unsuccessful, and on or about July 25, 2013, Plaintiff sought a refund of the Machine's purchase price from Defendant. *See id.* at ¶¶ 37-38. Defendant refused to refund the purchase price and did not fix the Machine's defects. *See id.* at ¶ 39.

On March 21, 2014, Plaintiff filed the instant complaint alleging six causes of action based in breach of contract, breach of express and implied warranties, and negligence. Plaintiff seeks damages of no less than $4,249,369, including lost profits, labor costs, and expenses.

## III. DISCUSSION

### A.    Failure to State a Claim

#### *1. Legal Standards*

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief and pleadings without considering the substantive merits of the case. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)

(citation omitted).  This presumption of truth, however, does not extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quoting Fed R. Civ. P. 8(a)(2)).  Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555, and present claims that are "plausible on [their] face," *id.* at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed," *id.* at 570.

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself" unless all parties are given a reasonable opportunity to submit extrinsic evidence. *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).  "In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a district court generally must confine itself to the four corners of the complaint and look only to the allegations contained therein." *Robinson v. Town of Kent*, No. 11 Civ. 2875, 2012 WL 3024766, *4  (S.D.N.Y. July 24, 2012) (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).  However, in considering a motion to dismiss, "the Court may consider documents attached as an exhibit thereto or incorporated by reference,

documents that are 'integral' to plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken." *Thomas v. Westchester County Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citations omitted).  To incorporate a document by reference, "the Complaint must make a clear, definite and substantial reference to the document[ ]." *Id.* at 275-76 (citations omitted).  Moreover, "when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce the [document] when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[O]n a motion to dismiss, a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993))). Notably, "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers*, 282 F.3d at 153 (footnote omitted).  As the Second Circuit has explained,

> [i]n most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason — usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim — was not attached to the complaint.  The exception thus prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting.

*Global Network*, 458 F.3d at 157 (citations omitted).

7

"Rule 12(b) gives district courts two options when matters outside the pleadings are presented in response to a 12(b)(6) motion: the court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988); *see also Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (quoting the same). Thus, while a court must convert a motion to dismiss for failure to state a claim into a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court," Fed. R. Civ. P. 12(d), conversion is not required if the court disregards the extrinsic material, *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) (matters outside the pleadings presented to the court were "excluded" within the meaning of Rule 12(d) by the district court's explicit refusal to consider the outside materials).

### 2. *Breach of Contract*

In Count I of the complaint, Plaintiff alleges that Defendant breached the Agreement by "failing to timely produce a continuous motion assembly machine meeting the requirements of Plaintiff and the Agreement." Dkt. No. 1 at ¶ 53. Defendant argues that Plaintiff cannot state a claim for breach of contract because it certified the Machine's compliance with the Agreement's specifications and accepted the Machine by signing off on the FAT and SAT. *See* Dkt. No. 11-1 at 6-9. In support of its arguments, Defendant attached a number of exhibits to its motion to dismiss, including the Agreement, Snap-N-Seal High-Speed Assembly System Proposal Number 506TNB001 Revision 10 (the "Proposal"), phase completion reports for phases 1, 3, and 4 of the project, and design review meeting minutes. *See* Dkt. No. 11-4; Dkt. No. 11-5; Dkt. No. 11-6; Dkt. No. 11-7; Dkt. No 11-12. Defendant also argues that Plaintiff cannot state a claim for breach

of contract based on untimely delivery because the parties agreed that the delivery dates could be changed and in fact did change those dates via signed change logs. *See* Dkt. No. 13 at 4. In support of this argument, Defendant submitted an exhibit containing a number of change logs executed by the parties. *See* Dkt. No. 13-2. Plaintiff urges the Court not to consider this argument because Defendant raised it for the first time in reply and to strike the exhibit because the change logs fall outside of the Agreement. *See* Dkt. No. 14.

As an initial matter, the Court declines to convert Defendant's motion into a motion for summary judgment. Neither party requested that Defendant's motion be so converted. In light of the fact-specific nature of Plaintiff's claims and the fact that no discovery has been completed, the Court declines to covert Defendant's motion *sua sponte*. *See Trs. of the Bldg. Trades Educ. Benefit Fund v. Crana Elec., Inc.*, No. 10 CV 2065, 2011 WL 4434190, *6 (E.D.N.Y. Sept. 22, 2011) (declining to convert the defendant's motion to dismiss to a motion for summary judgment where neither party requested conversion and no discovery had been taken). Accordingly, in deciding this motion, the Court will disregard the extraneous materials presented to it.

However, a number of Defendant's exhibits comprise documents that are integral to Plaintiff's complaint. Plaintiff's claims are based in their entirety upon the terms and effect of the Agreement. Plaintiff cannot escape the Court's consideration of the Agreement in evaluating the present motion simply because Plaintiff did not attach the Agreement to its complaint. Moreover, the Agreement expressly incorporates the Proposal and the change logs, and the Proposal incorporates the phase completion reports into the Agreement. Dkt. No. 11-4 at ¶¶ 1.2, 5.1, 20.1; Dkt. No. 11-5 at § 4.4. Therefore, the Court will consider these documents in deciding Defendant's motion.

9

Pursuant to the Agreement's choice-of-law provision, Plaintiff's contractual claims are governed by Ontario law.  *See* Dkt. No. 11-4 at ¶ 19.1.  Under Ontario law, the elements of a claim for breach of contract are "the particulars of the alleged contract including its terms, the nature of the alleged breach, causation and damages that are alleged to have flowed from the breach." *McCarthy Corp. PLC v. KPMG LLP*, No. 05-CL-5816, [2006] O.J. 1492, 2006 ON. C. LEXIS 1447, *22 (O.S.C.J. Apr. 3, 2006).  Ontario law provides that "[t]he general rule is that the words in a contract are to be given their plain, literal and ordinary meaning." *Argentini v. Wellington Ins. Co.*, 26 O.R.3d 408, 413 (O. Ct. J. Gen. Div. 1995).  "In a commercial contract the words must be construed in a business fashion and in accordance with business common sense so as to avoid any interpretation that would result in a commercial absurdity." *Id.*  Extrinsic evidence is admissible to explain ambiguous terms in a contract where the evidence does not qualify or contradict the written contract.  *See Doral Holdings Ltd. v. Steinberg Inc.*, 60 O.R.2d 554, 558 (O. High Ct. J. 1987).

Under the Canadian Sale of Goods Act (the "CSGA"),

> where the contract is for specific goods the property in which has passed to the buyer, the breach of any condition to be fulfilled by the seller can only be treated as a breach of warranty and not as a ground for rejecting the goods and treating the contract as repudiated.

Sale of Goods Act, R.S.O., ch. S.1 § 12.3 (1990), amended by R.S.O, c. 27, § 54 (1994).  A buyer is deemed to have accepted the goods when the buyer

> (a) intimates to the seller that the goods have been accepted; (b) after delivery, does any act in relation to them that is inconsistent with the ownership of the seller; or (c) after the lapse of a reasonable period of time, retains the goods without intimating to the seller that they have been rejected.

*Id.* at § 34.  Whether the buyer has accepted goods is a question of fact.  *Pharmrite, N. Am. Corp. v. Transpharm Can. Inc.*, [2004] O.J. 514, 2004 ON. C. LEXIS 705, *28 (O.S.C.J. Feb. 4, 2004).  A buyer's retention of goods "for a reasonable period of time in order to give the seller an opportunity to rectify the situation" ordinarily does not constitute acceptance, but a buyer's use of the goods suggests acceptance.  *Id.* at *28-29.

Here, it is undisputed that the Agreement was a valid contract.  The Agreement obligated Defendant to "deliver to [Plaintiff] a Machine . . . which shall materially conform to the Proposal and the design as approved in Phase 1 . . . and shall be provided in accordance with the Delivery Dates set out in the proposal."  Dkt. No. 11-4 at ¶ 1.3.  The Proposal sets forth specific production rates and machine effectiveness measures with which the Machine was to comply.  *See* Dkt. No. 11-5 at 19.  Plaintiff alleges that the Machine failed to "deliver[] the contractually required performance level," experienced "reoccurring problems" and "continuing output shortfalls," and did not deliver "the contractually agreed upon productivity requirements."  *Id.* at ¶¶ 32-35.  Additionally, Plaintiff alleges that although "the lead-time from the start of the project to [FAT] was said to be eight and one half months," "[Defendant] did not actually present the completed assembly machine for testing until . . . twenty months after the kick-off meeting" and that Defendant delivered the Machine "some two years and six months after the parties entered into the Agreement."  *Id.* at ¶¶ 22, 24, 30.  Plaintiff further alleges that Defendant's failure to deliver the Machine as specified and in a timely manner caused Plaintiff damages including the Machine's purchase price, labor costs, lost profits, and expenses including the hiring of an outside consultant to fix the Machine.  *See id.* at ¶¶ 42-48.  Plaintiff's allegations are sufficient to state a claim for breach of contract.

Defendant argues that Plaintiff has not stated a claim upon which relief can be granted because Plaintiff certified that the Machine did in fact meet the contractually agreed upon performance levels by signing off on completion of the FAT and SAT.  The Agreement provides that "[w]hen the Machine is completed, a [FAT] shall be carried out at [Defendant]'s facilities with [Plaintiff] in attendance in order to verify that the Machine complies in all material respects with the Proposal, Specifications and Design."  Dkt. No. 11-4 at ¶ 6.1.  It further provides that "[a] [SAT] shall be carried out in [Plaintiff]'s facility following installation and commissioning to ensure that the Machine complies in all material respects with the Proposal and the Design."  *Id.* at ¶ 8.2.  The FAT and SAT completion reports signed by Plaintiff both indicate that "[t]he sign-off of this completion report constitutes formal acceptance of the machine functionality."  Dkt. No. 11-6 at 2; Dkt. No. 11-7 at 2.

However, Plaintiff alleges that Defendant did not perform the FAT properly, utilizing more than one operator in violation of the terms of the Proposal and performing heavy cleaning such that the testing conditions did not simulate normal operating conditions.  *See* Dkt. No. 1 at ¶ 29.  Plaintiff further alleges that the Machine's production problems began almost immediately following the SAT.  *See id.* at ¶ 7.  Thus, Plaintiff has alleged that despite the Machine passing the FAT and SAT, it did not in fact perform in accordance with the contracted-for performance levels. *See id.* at 32-35.  The resolution of whether the Machine performed as was required by the Agreement and whether Plaintiff accepted the Machine involves questions of fact that are not appropriate for the Court to resolve on a motion to dismiss.[2]

---

[2] The Court also notes that under the CSGA, accepting specific goods prohibits a plaintiff from rescinding the contract, but not from seeking damages.  *See Pharmrite*, 2004 O.N. C. LEXIS 705 at *28.  Therefore, even if Plaintiff accepted the Machine, it may seek damages.

To the extent that Plaintiff alleges Defendant breached the Agreement by failing to adhere to the delivery schedule in the Proposal, Defendant argues that Plaintiff agreed to amend the delivery schedule by executing change and problem logs. *See* Dkt. No. 13 at 6.[3]  The Agreement provides that "[e]ither [party] may request a change to the Specifications, Proposal, Delivery Dates or other aspect of the arrangements between the parties . . .  Sign-off of the Change Log by both parties shall constitute an amendment to this Agreement." Dkt. No. 11-4 at ¶ 5.1; *see also id.* at ¶ 20.1 ("[A] signed off change log shall constitute a binding amendment to this Agreement.").  Defendant provided thirteen change logs signed by Plaintiff to demonstrate that Plaintiff acquiesced in amending the delivery schedule.  *See* Dkt. No. 13-3.  Although these change logs demonstrate that Plaintiff agreed to these specific amendments to the Agreement, the Court notes that Defendant has provided only selected logs – specifically, change logs number eight, thirteen, fourteen, and fifteen, and problem logs number nine through fifteen and seventeen. *See id.*  Without the parties' full amendments to the Agreement before it, the Court cannot conclude that Plaintiff is prohibited from alleging a cause of action for breach of contract based on Defendant's alleged delay in delivery.

Finally, Defendant argues that the Agreement's express warranty barred Plaintiff from seeking damages once it accepted the Machine for use.  *See* Dkt. No. 11-1 at 11.  The warranty clause provides, in relevant part, that

> [i]f the Machine or any parts of the Machine, *while in use by the Buyer, under normal operation for the purposes set out in the Proposal* . . . proves defective in material and/or workmanship, as

---

[3]  The Court denies Plaintiff's request that the Court decline to consider this argument in light of the fact that Plaintiff responded to this argument in its Sur-Reply.  *See Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 737 (S.D.N.Y. 2012) (noting that courts ordinarily should not consider arguments raised for the first time in reply papers because the plaintiff would not have had the opportunity to respond to the new arguments).

> determined by [Defendant]'s own inspection of the Machine, it will
> be repaired or replaced by [Defendant] free of charge . . . .

Dkt. No. 11-4 at ¶ 15.1 (emphasis added).  The Agreement further provides that "these remedies will be buyer's sole and exclusive remedies and will be in lieu of any other rights or remedies buyer may have against [Defendant] with respect to defects in the materials, workmanship or operations of the Machine, licensed software or other materials."  *Id.* at ¶ 15.3 (emphasis omitted).

Plaintiff alleges that it was never able to place the Machine into service at the contractually required level and that Defendant acknowledged this failure.  *See* Dkt. No. 1 at ¶¶ 36-37.  In a case with similar facts and an analogous liability limitation provision, an Ontario court found the provision inapplicable to the plaintiff's breach of contract claim.  *See Nat'l Satellite Newservice Inc. v. Canadian Satellite Commc'ns Inc.*, 1997 O.T.C. LEXIS 2032, *10-12 (O. Ct. J. Gen. Div. Jan. 22, 1997).  There, the parties entered into an agreement under which the defendant would provide the plaintiff with a satellite network that would deliver information from the plaintiff's customers to printers at designated end use locations.  *See id.* at *4-5.  The defendant's system failed to reliably deliver information from its satellite to the end sites, which the court found "was totally a failure of the defendant's system."  *Id.* at *6.  The defendant sought to avoid liability by invoking a contract provision which limited its liability to the plaintiff for "any direct cost, expense, loss or damage arising from the use of [the network]" to a specified amount.  *See id.* at *10-11.  The court concluded that the provision did not limit the defendant's liability because

> the defendant acknowledged the failure of the system to the plaintiff
> in August 1994.  The plaintiff's claim for damages is not in
> connection with the use of the system but with its inability to use
> the system at all.  The situation was tantamount to a fundamental

breach of the contract, and the clause as drafted does not purport to
apply in that case.

*Id.* at *12.

Similarly, here, Plaintiff claims that the Machine was so defective that Plaintiff was not able to use it at all and that Defendant recognized this failure. *See* Dkt. No. 1 at ¶ 34-36. The warranty clause applies where the Machine is "in use by the Buyer, under normal operation for the purposes set out in the Proposal." Dkt. No. 11-4 at ¶ 15.1. Accepting Plaintiff's allegations as true, as the Court must on a motion to dismiss, the warranty clause does not apply because Plaintiff was never able to use the Machine under normal operation. Moreover, the warranty clause applies to defects in material and workmanship, and does not apply to Plaintiff's allegations that the Machine was defective as designed. *See* Dkt. No. 1 at ¶ 35. Therefore, the warranty does not bar Plaintiff's breach of contract claim. Accordingly, Defendant's motion to dismiss Plaintiff's claim for breach of contract is denied.

### 3. Breach of Express Warranty

In Count II of the complaint, Plaintiff alleges that Defendant breached the Agreement's express warranty by failing to repair or replace the Machine when it proved defective. *See* Dkt. No. 1 at ¶¶ 56-64. Defendant argues that Plaintiff failed to allege facts satisfying the conditions necessary to trigger the warranty and establishing Defendant's breach of the warranty. *See* Dkt. No. 11-1 at 14-16.

A claim for breach of express warranty requires a plaintiff to allege a contractual relationship between the parties, the existence of a warranty, and a breach of the warranty. *See Singer v. Schering-Plough Canada Inc.*, No. CV-08-00359531-0000CP, [2010] O.J. 113, 2010 ON. C. LEXIS 27, *43-48 (O.S.C.J. Jan. 7, 2010). Ontario law provides that

15

> [i]n the context of the sale of goods, warranties are defined as an
> agreement with reference to the goods that are the subject of a
> contract but collateral to the main purpose of the contract.  A breach
> of such warranty gives rise to a claim for damages but not a right to
> reject the goods.

*Id.* at *45 (quoting *Wuttenee v. Merck Frosst Canada Ltd.*, [2007] 4 W.W.R. 309 ¶ 66-67 (Sask.

Ct. Queen's Bench 2007)).

       In the present matter, the warranty reads, in relevant part:

> If the Machine or any parts of the Machine, while in use by
> [Plaintiff], under normal operation for the purposes set out in the
> Proposal and receiving adequate and reasonable maintenance,
> proves defective in material and/or workmanship, as determined by
> [Defendant]'s own inspection of the Machine, it will be repaired or
> replaced by [Defendant] free of charge (subject to the limitations as
> set forth herein) for such defects as are identified and written notice
> is provided to [Defendant] during a period of one (1) year from the
> date of completion of SAT at Buyer's facility.  The foregoing
> limited warranty shall not be available and [Defendant] shall not be
> responsible (a) in the event of modification of the Machine or
> Licensed Software by [Plaintiff] or any third party or (b) for any
> defects in, damage to, or failure of operation of, all or any portion
> of the Machine or said spare parts caused by any improper
> installation or misapplication thereof or any intentional misconduct,
> fault or neglect in the operation or use of all or any portion of the
> Machine or said spare parts . . . .

Dkt. No. 11-4 at ¶ 15.1.  Defendant contends that the facts alleged in Plaintiff's complaint do not

establish that (1) Plaintiff provided written notice of the defects to Defendant; (2) Defendant

determined the Machine was defective upon inspection; (3) the Machine was under normal

operation and receiving reasonable maintenance; and (4) the defects were not due to any

modification, improper installation, or intentional misconduct or neglect by Plaintiff.  *See* Dkt.

No. 11-1 at 14-15.

       In the complaint, Plaintiff alleges that

> [t]he operation and performance problems with [the Machine] . . .
> were the subject of many urgent requests for [Defendant] to provide

> a machine which delivered the contractually required performance level.  While [Defendant] responded to these requests and made certain efforts to remedy the defective performance, the machine performance and production problems persisted.

Dkt. No. 1 at ¶ 33.  Plaintiff further contends that in September 2012, Defendant

> committed to ensuring that the [M]achine would achieve the contractually agreed upon productivity requirements that had yet to be met or delivered.  Moreover, at that time, [Defendant] acknowledged (unbeknownst to Plaintiff) that it had always anticipated certain mechanical issues with the machine that would require post-delivery work as a result of oversights in the original machine design.  Recognizing that [the Machine] had to be taken out of service for production and performance defects, [Defendant] subsequently acknowledged that all warranty periods for the machine would be tolled until the machine was performing properly and able to be placed back into service at the contractually required level.

*Id.* at ¶¶ 35-36.  Thus, Plaintiff's allegations establish that it notified Defendant of the defects, that Defendant determined the Machine was defective, and that the defects were caused by Defendant rather than by any act of Plaintiff.  Moreover, the Court can reasonably infer from Plaintiff's allegations – including the fact that Defendant made repeated efforts to remedy the defects – that Plaintiff's use and maintenance of the machine complied with the warranty.  Furthermore, Defendant's argument that Plaintiff did not state a claim for breach of express warranty because Plaintiff conceded that Defendant made efforts to remedy the Machine's defects is unavailing.  The warranty requires Defendant to repair or replace the Machine, not to attempt to do so.  Therefore, Plaintiff has stated a plausible claim that Defendant breached the express warranty.[4]

### 4.  Breach of Implied Warranties and Conditions

---

[4]  The Court notes that the warranty does not cover design defects.  Accordingly, Plaintiff's claim for breach of the express warranty is only cognizable to the extent that it asserts Defendant's failure to remedy defects in the material and/or workmanship of the Machine.

In Counts III, IV, and V of the complaint, Plaintiff alleges that Defendant breached an implied warranty of merchantability, implied warranty of fitness for a particular purpose under the CSGA, and implied condition that the Machine would be fit for its intended purpose. *See* Dkt. No. 1 at ¶¶ 65-93. Defendant argues that each claim should be dismissed because Defendant disclaimed all implied warranties or conditions in the Agreement. *See* Dkt. No. 11-1 at 12-14.

Section 14 of the CSGA provides that "[w]here there is a contract for the sale of goods by description, there is an implied condition that the goods will correspond with the description." Sale of Goods Act § 14. The CSGA further provides that

> there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract of sale, except as follows:
>
> 1. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required so as to show that the buyer relies on the seller's skill or judgment, and the goods are of a description that it is in the course of the seller's business to supply (whether the seller is the manufacturer or not), there is an implied condition that the goods will be reasonably fit for such purpose, but in the case of a contract for the sale of a specified article under its patent or other trade name there is no implied condition as to its fitness for any particular purpose.
>
> 2. Where goods are bought by description from a seller who deals in goods of that description (whether the seller is the manufacturer or not), there is an implied condition that the goods will be of merchantable quality, but if the buyer has examined the goods, there is no implied condition as regards defects that such examination ought to have revealed.

*Id.* at § 15(1)-(2). Thus, the requirements for an implied warranty of fitness for a particular purpose under CSGA Section 15(1) are as follows: (1) the goods were in the course of the seller's business, (2) the seller knew the particular purpose of the goods, and (3) the buyer relied on the seller's skill or judgment in purchasing the goods. *See Muskoka Fuels v. Hassan Steel*

18

*Fabricators Ltd.*, 280 O.A.C. 325, 2011 ON.C. LEXIS 10473, *8 (O. Ct. App. 2011).  Section

15(1) of the CSGA provides an exception to the implied warranty of fitness for a particular

purpose for "the sale of a specified article under its patent or other trade name."  Sale of Goods

Act § 15(1).  "Under Ontario law, the [exception] only applies where the buyer specified the

article under its trade-name 'in such a way as to indicate that he is satisfied, rightly or wrongly,

that it will answer his purpose, and that he is not relying on the skill or judgment of the seller,

however great that skill or judgment might be.'"  *IPEX Inc. v. Lubrizol Advanced Materials*

*Canada Inc.*, No. CV-08-00365112, [2012] O.J. 2218, 2012 ON. C. LEXIS 4111, *29 (O.S.C.J.

May 18, 2012) (quoting *Chabot v. Ford Motor Co. of Canada Ltd.*, 39 O.R.2d 162, 181 (O. High

Ct. J. 1982)).  "The mere fact that a sales contract describes an article by its trade-name does not

make it a sale under a trade-name for the purpose of [Section 15(1)]."  *Id.*

   Under Section 15(2) of the CSGA, a warranty of merchantability is implied in contracts

for the sale of goods bought by description from a seller that generally deals in goods of that

description.  Sale of Goods Act § 15(2).  "'[I]f goods are sold under a description which they

fulfill, and if goods under that description are reasonably capable in ordinary use[] . . . of several

purposes, they are of merchantable quality . . . if they are reasonably capable of being used for

any one or more of such purposes, even if unfit for use for that one of those purposes which the

particular buyer intended.'"  *Nordic Aero Servs. Inc. v. Air Canada*, Doc. 93-CQ-38172, [1995]

O.J. 2178 ¶ 68 (O. Ct. J. Gen. Div. July 19, 1995) (quoting *Canada Atl. Grain Exp. Co. v. Eilers*,

35 Com. Cas. 90 ¶ 102 (1929)).  An article "is not merchantable . . . if it has defects unfitting it

for its only proper use but not apparent on ordinary examination."  *Murray v. Sperry Rand Corp.*,

23 O.R.2d 456, 463 (O. High Ct. J. 1979).

Here, in Count III of the complaint, Plaintiff alleges that the Machine did not operate as was described in the Agreement and that it contained material defects that made it unfit for its intended use. *See id.* at ¶¶ 67-74. In light of the fact that the Machine was custom-made for Plaintiff's intended use, that use was the only proper use of the Machine. Therefore, Plaintiff's allegations sufficiently state a claim for breach of implied warranty of merchantability under the CSGA. *See Casden v. Cooper Enters. Ltd.*, 151 N.R. 199, 209 (Fed. Ct. App. 1993) (explaining that in the context of custom-made articles, the court must "look at the circumstances of [the] case to determine what is merchantable, that is, what a reasonable person acting reasonably would after a full examination accept in performance of an offer to buy an article").

In Count IV, Plaintiff alleges that as a result of the parties' extensive negotiations, Defendant knew of the intended purpose and use of the Machine, that Defendant's course of business included the regular manufacture and sale of custom-made continuous motion assembly machines, that Plaintiff relied upon Defendant's skill and judgment in contracting for the Machine, and that the Machine was not fit for its intended purpose. *See* Dkt. No. 1 at ¶¶ 79-83. Such allegations are sufficient to state a claim for breach of implied condition of fitness for a particular purpose under the CSGA. Defendant's contention that the Agreement falls within the exception for contracts for a specified article under its patent or other trade name is unavailing. Even if the "Snap-N-Seal High-Speed Assembly System" identifier appearing on the Proposal cover could be construed as a trade name – which the Court finds implausible because the name refers solely to the custom Machine designed for Plaintiff – Plaintiff's allegations clearly state that it relied on Defendant's expertise and skill to ensure that the Machine met Plaintiff's intended purpose, not a trade name.

Plaintiff's fifth cause of action largely repeats the allegations in Count IV and asserts a separate cause of action for "breach of implied condition" that the Machine would be fit for its intended purpose. *See* Dkt. No. 1 at ¶¶ 86-93.  The CSGA expressly states that "there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract of sale, except" under Section 15(1).  Sale of Goods Act § 15.  Thus, Plaintiff cannot state a claim for "breach of implied condition" separate from its claim for breach of implied condition under the CSGA.  Defendant's motion to dismiss Plaintiff's fifth cause of action is therefore granted.

Defendant argues that Plaintiff's remaining implied warranty claims are nonetheless barred by the Agreement's waiver of implied warranties and conditions.  The waiver provision reads as follows:

> Except as expressly provided in this agreement, all services and [Defendant's] products and technology, including but not limited to the Machine are provided "as is."  [Defendant] disclaims any implied warranties or conditions of merchantability, non-infringement or fitness for a particular purpose, and any warranties arising by statute or otherwise in law or from a course of dealing or usage of trade.

Dkt. No. 11-4 at § 14.1 (emphasis omitted).

Pursuant to Section 53 of the CSGA,

> [w]here any right, duty or liability would arise under a contract of sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by usage, if the usage is such as to bind both parties to the contract.

Sale of Goods Act § 53.  Under this provision, a seller may disclaim the implied warranties and conditions contained in the CSGA, but must use explicit, clear, and unambiguous language to do so.  *IPEX*, 2012 ON. C. LEXIS 4111 at *26-27.  Such exclusionary provisions are enforceable except for "where the contract is unconscionable, as might arise from situations of unequal

21

bargaining power between the parties." *Hunter Eng'g Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426 ¶ 64 (Can.).  Ontario courts perform a three-stage analysis for determining whether a disclaimer clause is enforceable:

> In the first stage, the court asks whether, as a matter of interpretation, the clause applies to the circumstances.  If the exclusion clause does apply, then, in the second stage, the court asks whether the exclusion clause was unconscionable at the time the contract was made.  If the exclusion clause is held to be valid and applicable, in the third stage, the court asks whether the court should refuse to enforce the valid exclusion clause because of the existence of an overriding public policy (proof of which lies on the party seeking to avoid enforcement of the clause) that outweighs the very strong public interest in the enforcement of contracts.

*Arora v. Whirlpool Canada LP*, No. 10-CV-404742CP, [2012] O.J. 3865, 2012 ON. C. LEXIS 6275, *88 (O.S.C.J. Aug. 16, 2012) (citing *Tercon Contractors Ltd. v. British Columbia*, [2010] 1. S.C.J. 69 (Can.)).

Plaintiff first argues that the disclaimer clause does not apply to its implied warranty claims.  Plaintiff contends that the disclaimer is ambiguous and that "a reasonable interpretation of this Section, especially given that it precedes the section on indemnification against third-party claims, is that [Defendant] is disclaiming any implied warranties for third-party components incorporated into the Machine."  Dkt. No. 12 at 19.  The Court does not agree that this is a plausible interpretation of the disclaimer clause.  The disclaimer unambiguously states that it applies to Defendant's products, including the Machine.  Moreover, Defendant disclaims liability for third-party components in a separate clause of the Agreement.  *See* Dkt. No. 11-4 at § 15.2.  Further, the disclaimer is clear and explicitly disclaims implied conditions and warranties of merchantability and fitness for a particular purpose.  Therefore, the Court finds that the disclaimer clause applies to Plaintiff's implied warranty claims.

Plaintiff further argues that even if the warranty disclaimer is applicable, it is unconscionable, and thus unenforceable, because Defendant knew of potential defects in the Machine before delivering it to Plaintiff. *See* Dkt. No. 12 at 20. Plaintiff's argument ignores that the unconscionability of an exculpatory clause is evaluated at the time that the contract was made. *See Arora*, 2012 ON. C. LEXIS 6275, at *88. Moreover, the focus of the unconscionability inquiry is whether an imbalance in bargaining power existed between the parties. *See Hunter*, [1989] 1 S.C.R. at 462, 464; *see also 743513 Ontario Ltd. v. Huang*, No. CV-12-464-00, [2013] O.J. 5921, 2013 ON. C. LEXIS 5981, *12 (O.S.C.J. Dec. 18, 2013) ("[T]he test for unconscionability involves a two-part analysis — a finding of inequality of bargaining power and a finding that the terms of the agreement have a high degree of unfairness or were an abuse of bargaining power."). Plaintiff has not alleged any facts that suggest an imbalance in bargaining power between its predecessor in interest, Thomas & Betts, and Defendant. To the contrary, Plaintiff acknowledged numerous times that the parties engaged in substantial negotiations regarding the terms of the Agreement. *See, e.g.*, Dkt. No. 1 at ¶¶ 17-18; Dkt. No. 12 at 14. In the absence of any allegation of unequal bargaining power, the Court has no basis for finding that the implied warranty disclaimer is unconscionable.

Finally, to the extent that Plaintiff's argument can be read as arguing that the Court should refuse to enforce the disclaimer because of an overriding public policy against permitting sellers to avoid liability when they deliver goods they know are defective, Defendant's alleged conduct is insufficient to overbear the strong public interest in the enforcement of freely bargained-for contracts. Canadian courts are reluctant to exercise "the ultimate power to refuse to enforce a contract" on public policy grounds, only doing so where the breaching party's conduct violates "substantially incontestable considerations of public policy," such as where the party engaged in

23

criminality or egregious fraud or knowingly risked harm to human life. *Tercon*, [2010] 1 S.C.R. 69 at ¶ 118 (Binnie, J., dissenting) (internal quotation marks omitted).  Plaintiff's allegations establish, at worst, that Defendant realized potential defects in the Machine prior to delivery. This does not rise to the level where public policy would justify the Court refusing to enforce the disclaimer that was freely agreed to by Plaintiff's predecessor.[5]

Thus, Plaintiff's claims for breach of implied warranty of merchantability and implied condition of fitness for a particular purpose are barred by the Agreement's exculpation clause. Defendant's motion to dismiss Plaintiff's implied warranty claims are therefore granted.

### 5. *Negligence*

In Count VI of the complaint, Plaintiff alleges that Defendant's design and/or manufacture of the Machine and representations concerning Defendant's ability to deliver a machine that could perform as specified were negligent.  *See* Dkt. No. 1 at ¶¶ 94-102.  Defendant argues that Plaintiff has not stated a cognizable negligence claim because it has not alleged that Defendant owed Plaintiff a legal duty independent of the contract itself.  *See* Dkt. No. 11-1 at 16.

As an initial matter, the parties appear to agree that New York law applies to Plaintiff's tort claims.  *See id.*; Dkt. No. 12 at 21-32.  The Court agrees.  New York courts "are reluctant to construe choice-of-law provisions broadly to encompass non-contractual claims" and "have consistently held that language that the 'agreement itself' is to be governed by a particular law is too narrow to cover noncontractual claims."  *Innovative BioDefense, Inc. v. VSP Techs., Inc.*, No.

---

[5]  The Court also notes that the implied warranty waiver does not leave Plaintiff without a remedy for Defendant's alleged breach, as it does not bar Plaintiff's breach of contract or express warranty claims.  *See Hiram Walker & Sons Ltd. v. Shaw, Stone & Webster Canada L.P.*, No. 07-CV-341104PD2, [2011] O.J. 5300, 2011 ON. C. LEXIS 15307, *28-29 (O.S.C.J. Nov. 24, 2011) (finding that a liability limitation clause was not against public policy where it left the plaintiff with the remedy for which the parties had contracted).

12 Civ. 3710, 2013 WL 3389008, *4 (S.D.N.Y. July 3, 2013) (citing *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 334-25 (2d Cir. 2005)) (other citations omitted). Here, the choice-of-law provision provides that "[t]his Agreement shall be governed by, and construed and enforced in accordance with the substantive laws of the Province of Ontario, Canada, and Canadian federal law applicable therein."  Dkt. No. 11-4 at ¶ 19.1.  This language is not broad enough to cover Plaintiff's non-contractual claims.  Therefore, the Court must apply New York choice-of-law principles to determine the appropriate law to apply to Plaintiff's tort claims.

"New York courts employ an 'interest analysis' to determine what law should govern tort claims."  *VSP*, 2013 WL 3389008 at *6.  The interest analysis requires the Court to determine "which jurisdiction has the greatest interest in the litigation in light of its relationship or contact with the occurrence or the parties."  *Id.* at *6 n.8.  The contacts relevant to this analysis "are, almost exclusively, the parties' domiciles and the locus of the tort."  *Id.*  "If the defendant's conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, 'the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred.'  Thus, the place of occurrence of the tort is 'determined by where the plaintiffs' injuries occurred.'"  *Id.* (citations omitted) (quoting *Schultz v. Boy Scots of Am., Inc.*, 65 N.Y.2d 189, 195 (1985)).

Here, Plaintiff is domiciled in New York and Defendant is domiciled in Ontario. Although Defendant's alleged negligent manufacture or design occurred in Ontario, Plaintiff suffered its alleged injuries in New York, where it is located.  The Court thus finds that New York law applies to Plaintiff's tort claims.

Under New York law, "'[n]egligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract. The two claims may be submitted as alternatives to the jury.'" *Dorking Genetics v. United States*, 76 F.3d 1261, 1269 (2d Cir. 1996) (citations omitted). However, such a tort claim requires 'the plaintiff [to] allege[] that 'a legal duty independent of the contract itself has been violated,'" such as a professional standard of care. *Id.* (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)). "This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick*, 70 N.Y.2d at 389. "Merely charging a breach of a 'duty of due care', employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim." *Id.* at 390.

A negligent misrepresentation claim in New York requires a plaintiff to plead that the defendant and the plaintiff had a special relationship which created a duty for the defendant to provide correct information. *See Nebraskaland, Inc. v. Sunoco, Inc.*, No. 10 CV 1091, 2011 WL 6131313, *3 (E.D.N.Y. July 13, 2011) (citing *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)).[6] "Generally, '[a] simple commercial relationship . . . does not constitute the kind of special relationship necessary for a negligent misrepresentation claim.'" *Id.* (quoting *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 215 (S.D.N.Y. July 9, 2007)); *see also Aerolineas Galapagos, S.A. v. Sundowner Alexandria, LLC*,

---

[6] The other elements of a negligent misrepresentation claim in New York are (1) the defendant made a false representation that it should have known was false; (2) the defendant knew the plaintiff desired the information supplied in the representation for a serious purpose; (3) the plaintiff intended to rely and act upon the defendant's representation; and (4) the plaintiff reasonably relied on the defendant's representation to the plaintiff's detriment. *See Nebraskaland, Inc.*, 2011 WL 6131313 at *3.

74 A.D.3d 652, 653 (1st Dept. 2010) (finding the plaintiff's proposed amended claim for negligent misrepresentation "palpably insufficient as a matter of law" because "the parties to the agreements dealt at arm's length, so the close relationship required to support the negligent misrepresentation claim was lacking").

Morever, New York's economic loss rule prohibits the tactic of seeking recovery in tort for damages remediable in contract. *Carmania Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F. Supp. 936, 940 (S.D.N.Y. Feb. 2, 1989).  Pursuant to this rule,

> New York law preserves the[] distinctions [between the laws of tort and contracts] by restricting plaintiffs who have suffered 'economic loss,' but not personal or property injury, to an action for the benefits of their bargains.  If the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort.

*Id.* (citing *Key Int'l Mfg., Inc. v. Morse/Diesel, Inc.*, 142 A.D.2d 448 (2d Dept. 1988)) (other citations omitted).  New York courts have recognized exceptions to the economic loss rule in cases of professional malpractice, for certain contracts for the provision of services, and where the defendant had a duty independent of its contractual obligations to the plaintiff.  *See Nebraskaland*, 2011 WL 6131313 at *4-5 and cases cited therein.

As the basis for its tort claims, Plaintiff alleges that Defendant owed Plaintiff a duty of care "[a]s the designer and manufacturer of the [Machine]."  Dkt. No. 1 at ¶ 95.  This duty plainly springs from the Agreement itself, and Plaintiff has alleged no facts suggesting that Defendant owed any extraneous duties to Plaintiff.  As to Plaintiff's negligent misrepresentation claim, Plaintiff has failed to allege facts establishing a relationship between Plaintiff and Defendant outside of that of a buyer and seller in an arm's length sales contract.  This relationship is insufficient to support a negligent misrepresentation claim.  Furthermore, Plaintiff's alleged injuries are all forms of economic loss.  As none of the recognized exceptions to New York's

economic loss rule are applicable here, even if Plaintiff could state negligence and negligent misrepresentation claims, such claims would be barred by the economic loss doctrine. Accordingly, Defendant's motion to dismiss Plaintiff's sixth cause of action for negligence and/or negligent misrepresentation is granted.

### 6. Limitation of Liability

Defendant also argues that the Agreement expressly prohibits lost profits and other indirect damages and, therefore, Plaintiff cannot bring a claim for indirect damages. *See* Dkt. No. 11-1 at 6. Defendant further argues that the Agreement expressly caps either party's liability for claims arising out of the Agreement to the total purchase price of the Machine. *See id.*

Section 14.3 of the Agreement reads as follows:

> Except for liability in relation to Section 13 (indemnification): (A) neither party shall have any liability to the other for any incidental, special, statutory, punitive, exemplary, indirect or consequential damages, or for any loss of profits, revenue, data, or cost of cover; and (B) in no event will the total aggregate liability of either party for each and all claims arising out of or in connection with this agreement or any products or services provided under this agreement exceed an amount equal to the total amount payable by [Plaintiff] to [Defendant] under this Agreement(.)

Dkt. No. 11-4 at § 14.3 (emphasis omitted).

Plaintiff argues that the limitation of liability clause is unenforceable because Defendant's conduct amounted to a fundamental breach of the Agreement. This argument is not supported by the relevant law. The same legal principles that the Court discussed in its analysis of the enforceability of the implied warranty disclaimer, *supra* Section III(A)(4), apply to the enforcement of provisions limiting a party's liability to a certain type or a set amount of damages. Plaintiff acknowledges that under Canadian law, an exculpatory clause in a contract will be enforced unless the contract is unconscionable. *See Hunter*, [1989] 1 S.C.R. 426 ¶ 64. Plaintiff

then asserts that the Canadian Supreme Court nonetheless held in *Hunter* that a clause limiting liability may be invalidated in the event of a fundamental breach.  *See* Dkt. No. 12 at 24.  The Court disagrees.  In *Hunter*, in the context of enforcing exclusionary clauses, the Canadian Supreme Court explicitly "reject[ed] the doctrine of fundamental breach and adopt[ed] an approach that binds the parties to the bargains they make, subject to unconscionability."  [1989] 1 S.C.R. 426 ¶ 66.  The language on which Plaintiff relies refers to the availability of the fundamental breach doctrine to permit a non-breaching party to repudiate a contract and refuse to perform its future obligations under the contract, not to invalidate an exculpatory clause.

The proper inquiry for determining whether the Agreement's liability limitations are enforceable is the three-step analysis set out by the Canadian Supreme Court in *Tercon*, discussed above.  Plaintiff does not argue, and the Court has no basis for finding, that the clause does not apply to Plaintiff's claims for labor costs, lost profits, and other incidental or consequential damages exceeding the purchase price paid for the Machine.  The Agreement unambiguously bars incidental, special, indirect, and consequential damages, and limits the liability of either party to "the total amount payable by [Plaintiff] to [Defendant] under this agreement."  Dkt. No. 11-4 at § 14.3.  Plaintiff argues that the Agreement was unconscionable because "the very thing bargained for – a Machine that satisfied the parties' agreed-upon performance requirements – was never provided."  Dkt. No. 12 at 24-25.  Plaintiff's argument is essentially an argument for fundamental breach couched in terms of unconscionability.  As the Court has already discussed, unconscionability in this context requires an allegation of unequal bargaining power at the time the contract was formed, which Plaintiff does not allege.  Finally, Plaintiff has not stated a public policy concern that would justify refusing to enforce the parties' freely negotiated limitations on liability.

Therefore, Defendant's motion to dismiss Plaintiff's claims for lost profits, labor costs, and other incidental or consequential damages in excess of the total amount payable by Plaintiff to Defendant under the Agreement is granted.[7]

**B.**     ***Forum Non Conveniens***

As an alternative ground for its motion, Defendant argues that the Court should dismiss the complaint in its entirety pursuant to the doctrine of *forum non conveniens*. *Forum non conveniens* affords a court broad discretion to dismiss an action where adjudication in another forum "will best serve the convenience of the parties and the ends of justice." *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 527 (1947). The Second Circuit has outlined a three-step process for analyzing whether *forum non conveniens* dismissal is appropriate. *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) (en banc). First, "the court must determine 'what deference is owed a plaintiff's choice of forum.'" *Traver v. Officine Meccaniche Toschi S.P.A.*, 233 F. Supp. 2d 404, 415 (N.D.N.Y. 2002) (quoting *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 498 (2d Cir. 2002)). "'[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir. 2002) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Thus, "a court should begin with the assumption that a plaintiff's choice of forum will stand unless the defendant can demonstrate that reasons exist to afford it less deference." *Id.* (citing *Iragorri*, 274 F.3d at 70-71). "[A] plaintiff's choice of forum is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum." *Iragorri*,

---

[7] Plaintiff alleges that it paid Defendant a total of $1,568,016 for the Machine. The Court takes no position on whether this amount is in fact the total amount payable by Plaintiff to Defendant under the Agreement. The Agreement refers to the Proposal to define the purchase price, which calculates a purchase price but provides that the purchase price is subject to change. *See* Dkt. No. 11-4 at § 2.1; Dkt. No. 11-5 at § 3.1.

274 F.3d at 71 (citing *Koster*, 330 U.S. at 524) (other citation omitted).  "Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection . . . to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the [chosen forum], the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*."  *Id.* at 72.

Next, "the court must consider whether an adequate alternative forum exists."  *Id.* at 73. "An alternative forum is ordinarily adequate if the defendants are amenable to service of process there and the forum permits litigation of the subject matter of the dispute."  *Monegasque*, 311 F.3d at 499.

If an adequate alternative forum exists, the court "must balance two sets of factors to determine whether the case should be tried in [the chosen] forum or in the alternative forum." *Traver*, 233 F. Supp. 2d at 415 (citing *Monegasque*, 311 F.3d at 500).  The first set of factors – the private interest factors related to the convenience of the litigants – includes

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Iragorri*, 274 F.3d at 73-74 (quoting *Gilbert*, 330 U.S. at 508) (internal quotation marks omitted). "In applying these factors, 'the court should focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues.'"  *Monegasque*, 311 F.3d at 500 (quoting *Iragorri*, 274 F.3d at 74).  The second set of factors – the public interest factors – include "the administrative difficulties associated with court congestion; the imposition of jury duty upon those whose community bears no relationship to the litigation; the local interest in

resolving local disputes; and the problems implicated in the application of foreign law." *Id.* (citing *Gilbert*, 330 U.S. at 508-09). Therefore, while "the need to apply foreign law favors dismissal . . .[,] this factor alone is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260 n.29 (1981) (citations omitted).

Here, Plaintiff sued in its home district, and thus the Court must apply a strong presumption in favor of Plaintiff's choice of forum. Defendant argues that the Court should afford Plaintiff's choice of forum less deference because Plaintiff is a multinational company with international facilities, including one in Toronto. *See* Dkt. No. 13 at 8. Nonetheless, it is reasonable to presume that Plaintiff's choice of its home forum was motivated by convenience. *See Piper*, 454 U.S. at 255-56. Notably, the action itself has a connection to this forum, as the Agreement was executed in New York and the Machine is located within this district. *See* Dkt. No. 12 at 26. Additionally, many of Plaintiff's witnesses are located in its home district. *See id.* Thus, Plaintiff's choice of forum is entitled to substantial deference.

Defendant asserts that Ontario is an adequate alternative forum and that Defendant is amenable to service of process in Ontario. *See* Dkt. No. 11-1 at 15. Plaintiff does not dispute this contention. *See* Dkt. No. 12 at 27. Therefore, the Court finds that Ontario is an adequate alternative forum for this action.

Defendant further contends that the private interest factors favor the alternative forum because Defendant's witnesses and documents are located in Ontario. *See* Dkt. No. 11-1 at 18. Plaintiff asserts that its evidence and witnesses are located in this district, as well as the Machine itself and the relevant premises. *See* Dkt. No. 12 at 28. Outside of the conclusory statement that "[i]t would be extremely burdensome to [Defendant] to have to litigate this case in New York,"

Defendant has not explained why transporting its documents and pertinent evidence from Ontario to New York would be unduly burdensome. Dkt. No. 11-2 at ¶ 10. Indeed, transporting the Machine to Ontario, if necessary, would be more burdensome than Defendant transporting its documents to New York. Further, Defendant does not contend that it anticipates the need to call unwilling third-party witnesses who could not be compelled to testify in this district. In contrast, Plaintiff anticipates the need to call non-party witnesses who may be beyond the Ontario courts' reach for compelled testimony. *See* Dkt. No. 12 at 28. Therefore, the private interest factors cannot be said to strongly favor Defendant.

With respect to the public interest factors, Defendant argues that because the Agreement is governed by Ontario law, the problems implicated by asking this Court to apply foreign law weigh in favor of dismissal. Dkt. No. 11-1 at 18. Moreover, Defendant argues that the Ontario courts have an interest in resolving this litigation because the design, manufacture, and initial testing of the Machine took place in Ontario. *See id.* at 18-19. In response, Plaintiff argues that this Court has an equal interest in resolving this dispute because the Machine was designed for and remains in its Horseheads facility and a number of events related to Plaintiff's claims occurred in New York, including the execution of the Agreement, meetings between Plaintiff and Defendant to discuss resolution of the Machine's performance problems, and repair efforts. *See* Dkt. No. 12 at 28-29. The Court agrees that both Ontario and New York have local interests in this litigation. Further, both forums bear a relationship to the litigation sufficient to justify adding the case to either forum's docket or imposing jury duty upon the forum's residents. It is true that permitting the action to remain in this district will require the Court to apply Ontario law. Although this factor weighs in favor of dismissal, it is insufficient to warrant dismissal where, as here, a balancing of all relevant factors shows that Plaintiff's choice of forum was appropriate.

After carefully considering all of the relevant factors, the Court concludes that Defendant has failed to establish that the factors strongly balance in favor of Defendant such that disturbing Plaintiff's choice of its home forum would be justified.  Therefore, the Court denies Defendant's motion to dismiss based upon the doctrine of *forum non conveniens*.

### IV. CONCLUSION[8]

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion to dismiss is **GRANTED in part** and **DENIED in part**;[9] and the Court further

**ORDERS** that Plaintiff's breach of implied warranty of merchantability claim, breach of implied warranty of fitness for a particular purpose claim, breach of implied condition claim, and negligence and/or negligent misrepresentation claims are **DISMISSED** with prejudice; and the Court further

---

[8] Although Plaintiff has not sought leave to amend its Complaint, the Court notes that amendment would be futile.  The Court has found as a matter of law that the Agreement does not permit Plaintiff to recover for breach of implied warranties or to seek lost profits or indirect or consequential damages.  With respect to Plaintiff's tort claims, the Court has concluded that such claims are barred by the economic loss doctrine and, therefore, cannot be maintained, even were Plaintiff to allege facts establishing the requisite independent legal duty and/or special relationship.  Since no amendment could remedy these defects, any such amendment would be futile.  *See Oneida Indian Nation of N.Y. v. City of Sherrill*, 337 F.3d 139, 168 (2d Cir. 2003), *rev'd on other grounds*, 544 U.S. 197 (2005) (holding that "amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)").

[9] As a result of this Memorandum-Decision and Order, the only remaining claims are Plaintiff's breach of contract and express warranty claims, although Plaintiff may not seek lost profits or incidental, special, indirect, or consequential damages for such claims.

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  January 26, 2015
        Albany, New York

Mae A. D'Agostino
U.S. District Judge

35